**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEMIANTRA M. CLAY, | No. CIV S-04-2367-DFL-CMK-P |
| Petitioner, | |
| vs. | <u>FINDINGS AND RECOMMENDATIONS</u> |
| MIKE KNOWLES, et al., | |
| Respondents. | |
| _____/ | |

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pending before the court is petitioner's petition for a writ of habeas corpus (Doc. 1), filed on November 4, 2004, respondent's answer (Doc. 6), filed on June 30, 2005, and petitioner's reply (Doc. 8), filed on November 28, 2005.

///
///
///
///
///
///

# I. BACKGROUND

A. **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Victim Johnson testified that he went to a house in Oak Park in late October 1997 to pick up a friend's dog. He was aware drug sales took place at the house.
>
> Victim McKissack opened the front door and indicated the dog was in back. Victim Johnson walked through the house toward the back door. The defendants were standing with Joe Barnes in a laundry room adjacent to the kitchen. Victim Johnson had known both Joe Barnes and defendant Flemmings for years, and he greeted them. He also recognized defendant Clay, whom he knew less well; he did know defendant Clay went by the nickname of "Bout It" and had a tattoo depicting the state of Arkansas. Victim Johnson was not aware anyone else was in the house.
>
> Without warning, Joe Barnes put victim Johnson in a choke hold and pointed a gun at his head. Defendant Clay was also holding a gun, and victim Johnson heard the two defendants ask, "Where's the dogs and money at?" Victim Johnson focused his attention on Joe Barnes, repeatedly asking how he could do this despite their long acquaintance. Joe Barnes whispered to be quiet, demurring to any attempt to harm him, and eventually released his hold.
>
> Defendant Flemmings disappeared momentarily into another part of the house. Victim Johnson heard a shot. When defendant Flemmings returned to the kitchen, victim Johnson first noticed that he, too, had a gun in his hand.
>
> Victim McKissack was sitting on the kitchen floor. Defendant Clay, who had his gun pointing toward him, asked, "Are you all about ready to do this?" Victim Johnson heard a shot and saw victim McKissack fall over, but did not see who had fired the shot.
>
> Victim Johnson fled with defendant Clay in pursuit, who grabbed his jacket and tussled with him as they reached the front door. Victim Johnson hit defendant Clay and slipped out of his jacket. Dashing across the front yard, he heard a voice behind him shout, "Shoot that nigger. Shoot that nigger." He believed the voice, which had a slight southern

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

accent, was defendant Clay's.  He heard three gunshots, felt the impact of bullets, and fell to the ground.

Victim Johnson had gunshot wounds to his back and abdomen.  Victim McKissack died of a gunshot wound to his head.  The police found victim Fort in a bedroom near the kitchen; he had gunshot wounds in his neck and chest, which resulted in paralysis.  Expert analysis of the bullet casings found at the scene established that all came from the same gun.

Victim Johnson provided police with the identities of the two defendants and their confederate.  Shortly after the shootings, defendant Flemmings fled to New York and defendant Clay fled to Arkansas.

Three months later defendant Flemmings was in custody on local charges in Rome, New York; after he revealed that he was wanted for murder in California, Sacramento detectives traveled to New York to interview him.  The jury heard an audio recording of that interview, in which he admitted planning to rob the house with the other two.  The three had entered the house with guns drawn.  He alone had shot all three victims.

Shortly thereafter, the police learned defendant Clay was in custody in Arkansas.  A detective traveled to Arkansas and met with defendant Clay's local attorney, who agreed to allow an interview with counsel present.  Defendant Clay admitted being present during the formation of plans to rob the drug house, bringing his gun to the house, and receiving a portion of the proceeds.  He denied shooting anyone.  He claimed to have participated only because the other told him that his girlfriend was among those in the house whom they would kill if he did not assist.  Defendant Clay claimed that he, not Joe Barnes, had held victim Johnson at gunpoint and allowed him to escape to prevent his death.

The former girlfriend of defendant Flemmings testified to being present when the three malefactors talked about committing a robbery.  Defendant Clay discussed the number of people who would be in the house.  She later drove with the three of them by the house.  She fled Sacramento with defendant Flemmings; at some point, he told her he had shot thee people that night.

The People jointly prosecuted defendant Clay as an adult with defendant Flemmings.  They prosecuted Joe Barnes separately.

### B. Procedural History

Petitioner was convicted of one count of first-degree murder and two counts of attempted murder.  The allegation that petitioner used a firearm in the commission of these offenses was found true.  Petitioner was sentenced to 55 years to life.

3

Petitioner appealed his conviction and sentence to the California Court of Appeal, which affirmed in an opinion issued June 27, 2003.[2]  The California Supreme Court denied review without comment.

## II.  STANDARD OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  For instance, when the state court reaches a decision on the merits, but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether the state court clearly erred in its application of Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). Similarly, when it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state

---

[2] While the Court of Appeal modified the judgment of conviction in some respects, as to all issues presented in this petition, the state court affirmed.  Specifically, the state court reversed petitioner's conviction for attempted robbery and instructed the trial court to dismiss the charge.  The state court also vacated petitioner's sentence in light of reversal of the attempted robbery conviction and remanded for re-sentencing.  In all other respects, the judgment of conviction as to the murder and attempted murder charges was affirmed.

court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner). When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

Where the AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

Under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 293 F.3d 1040,

1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

      State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See id.; see also Wiggins v. Smith, 123 S.Ct. 252 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refused to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). An "unreasonable application of" controlling law cannot be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 123 S.Ct. at 1175. This is because ". . . the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

### III. DISCUSSION

Petitioner claims as follows:

> The trial court committed prejudicial error under Miranda v. Arizona (1966) 384 US 436 [sic], when it admitted petitioner's in-custody confession to robbery and felony-murder because petitioner was denied his right to effective assistance of counsel when his Arkansas attorney advised him to give a statement to police, which amounted to a confession

to felony murder under California law.

The trial court committed prejudicial error when it admitted into evidence petitioner's confession to robbery and felony murder, because petitioner was denied his right to effective assistance of counsel as a result of his Arkansas attorney's advice that he confess to police, upon which he relied.

Petitioner claims that his rights were violated as a result of ineffective assistance of counsel. In other words, based on the way petitioner has framed his claims, if counsel's assistance was constitutionally adequate, the trial court did not err in admitting petitioner's confession. As to petitioner's reference to Miranda v. Arizona, 384 U.S. 436 (1966), it appears that petitioner is arguing that, due to ineffective assistance of counsel, any waiver of his Miranda rights was not voluntary or knowing. Thus, this petition raises one issue – ineffective assistance of counsel.

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. See id. at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. See id. at 690. The federal court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. See id. In making this determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. See Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.;

7

see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

As to petitioner's ineffective assistance of counsel claim, the state court reasoned:

> Defendant Clay asserts two bases for his challenge to the effectiveness of Arkansas counsel. Under the Fifth Amendment (out of which the *Miranda* protections arise (citations omitted)), he contends the prosecution bears the evidentiary burden of proving compliance with *Miranda* (citation omitted) and thus must bear the burden of *proving effective advice of counsel* in the decision to talk with investigators. Defendant Clay also makes the traditional argument of ineffective assistance under the Sixth Amendment in which he bears on direct appeal the twin burdens of establishing an *inexcusable* failing on the part of counsel and the reasonable likelihood of an otherwise more favorable result. (citations omitted).
>
> Defendant Clay frankly admits that he has no legal authority for his novel proposition under the Fifth Amendment that stands the evidentiary burden for ineffective assistance on its head. Nor does it have analytic allure: it is an entirely reasonable allocation of burdens to allow the People to prove the waiver of *Miranda* rights with counsel's advice, at which point a defendant is then free to rebut this prima facie case with evidence of ineffectiveness, as is customary under Sixth Amendment claims. We decline to adopt his proposal.
>
> As for his Sixth Amendment claim, we may skip the analysis of whether Arkansas counsel fell below prevailing professional norms and proceed directly to the question of prejudice. (citations omitted). We find there is no basis for his argument that the admission of his Arkansas statement prejudiced him. Other direct evidence established his culpability for all the offenses; the properly admitted statements of defendant Flemmings regarding defendant Clay's participation in the planning and execution of the robbery; the girlfriend's testimony about his participation in planning the robbery; and the testimony of victim Johnson that showed defendant Clay facilitated and encouraged the robbery and shootings of at least victims Johnson and McKissack. In point of fact, defendant Clay's statements actually provided the only basis for his duress and necessity defenses. Thus, it is not reasonably probably that the outcome of the trial could have been more favorable had Arkansas counsel advised defendant Clay to keep his silence. We consequently reject this argument.

It is clear from the foregoing that the state court applied the Strickland standard in addressing petitioner's ineffective assistance of counsel claim.  Therefore, because the state court applied the correct law, this court must review under the "unreasonable application of" standard.

Under this standard of review, even clear state court error is not enough to warrant federal habeas relief.  It thus follows logically that, if the state court was correct in its application of the proper rules of law, its decision cannot be an unreasonable application of such law.  Such is the case here.  As the state court noted, petitioner's confession (in the form of statements to police that he only participated in the robbery because he believed that his girlfriend would be killed if he did not) was the only basis for his duress and necessity defenses.  Therefore, if the evidence had not been admitted at all, the result of the trial could not have been better because there would have been no facts upon with to base a duress or necessity finding.  Or, to put it another way, the jury was only permitted to consider the defenses of duress and necessity because the confession was admitted into evidence.  Moreover, this court has independently reviewed the trial record and agrees with the state court that there is ample other direct evidence upon which the jury could have found guilt.  For these reasons, the court concludes that the state court was correct in deciding that petitioner suffered no prejudice, even if counsel's performance was deficient.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that the petition for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right

/ / /

1  to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

2

3  DATED:   December 12, 2005.

4

5  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   **CRAIG M. KELLISON**
6  UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26